605 So.2d 898 (1992)
QUICK CASH OF CLEARWATER, INC., a Florida corporation, Appellant,
v.
STATE of Florida, DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, DIVISION OF CONSUMER SERVICES, Appellee.
STATE of Florida, DEPARTMENT OF AGRICULTURE AND CONSUMER SERVICES, DIVISION OF CONSUMER SERVICES, Appellant,
v.
QUICK CASH OF TAMPA # 1, INC., a Florida corporation; Quick Cash of Tampa # 2, Inc., a Florida corporation; and Quick Cash of Tampa # 3, Inc., a Florida corporation, Appellees.
Nos. 91-03704, 92-00316.
District Court of Appeal of Florida, Second District.
August 28, 1992.
Robert G. Worley, Tallahassee, for State of Fla., Dept. of Agriculture and Consumer Services, Div. of Consumer Services.
H. Eugene Johnson, Tampa, for appellees Quick Cash of Clearwater, Inc., Quick Cash of Tampa # 1, Inc., Quick Cash of Tampa # 2 and Quick Cash of Tampa # 3.
ALTENBERND Judge.
These two cases involve efforts by the Division of Consumer Services (the Division) to enjoin several "Quick Cash" pawnshops that are lending money to customers through a highly unusual automobile loan/lease agreement. The Division argues that these transactions are illegal or unlawful for a multitude of reasons. It concludes that the agreements involve effective interest rates in excess of 500%. Quick Cash[1] maintains that the Division lacks the authority to file an action to enjoin its creative financing. In Hillsborough County, *899 the circuit court agreed with Quick Cash and quashed the complaint. In Pinellas County, the circuit court agreed with the Division and entered a temporary injunction. Although the statutory authority of the Division is quite confusing and needs to be clarified by the legislature, we conclude that the Division does have authority which may allow it to obtain an injunction concerning these transactions, at least if its proof establishes certain allegations. Accordingly, we reverse the Hillsborough County case and remand it to permit the Division to file an amended complaint. We further conclude that the Division did not prove its entitlement to a temporary injunction in Pinellas County. We reverse that injunction and remand for further proceedings consistent with this opinion.

I. A TYPICAL QUICK CASH TRANSACTION
The Division's complaint in Hillsborough County describes nine specific transactions that took place in 1991. The documents used in these transactions are not identical, but they are quite similar. We will use one of these complex transactions as an example.
Ms. Marie M. Crosby borrowed $200.00 from Quick Cash on April 17, 1991. She promised to repay the money over ten weekly installments. She signed a "pawn ticket" by which she pledged her 1981 Ford Mustang as collateral for the loan. The pawn ticket indicates that Quick Cash is entitled to record a security interest in the car with the proper authorities. The agreement indicates that the car can be sold if the debt is not paid. Although words seem to be missing from this document, it suggests that any excess amount from the sale will be paid to the debtor. Thus, the pawn ticket appears to contemplate a loan, and not a buy/sell agreement.
Ms. Crosby also signed a "customer disclosure form," which is referenced in the pawn ticket. This agreement informs the debtor:
QUICK CASH, INC. hereinafter referred to as The Company is not a loan company. We are a Pawnbroker. A "Pawnbroker" is a person or company who is regularly engaged in the business of making pawns. "Pawn" means the Loan of Money  a written or oral bailment of personal property as security for an engagement or debt, redeemable on certain terms and with the implied power of sale on default. Listed below is a full disclosure of all charges which will be assessed during the term of your pawn/loan:
In the "full disclosure," the agreement explains that Ms. Crosby borrowed $200.00, and she will repay the principal at the rate of $20.00 per week, plus 18% interest.
This financing becomes unusual, however, when the contract provides that Ms. Crosby will "rent" her car back from Quick Cash for $20.00 each week. Since Quick Cash will no longer have possession of her vehicle, the agreement states that her "vehicle title is [Quick Cash's] security for [her] loan/pawn." Quick Cash has no obligation to maintain the vehicle, and the pawn ticket provides that she is "solely responsible for maintaining current vehicle registration, tag and proper insurance on pledged property." Thus, Quick Cash appears to be "renting" a vehicle it does not own to a person who does, both in fact and in law, own the vehicle. Quick Cash is receiving "rent" merely to give up its bailment rights, relying thereafter upon only the title as security  just like a bank or loan company. Thus, in exchange for the rental payment, the transaction ceases to have the quintessential characteristic of a "pawn," i.e., a pledge of personal property, and becomes simply a typical consumer auto loan. See 54 Am.Jur.2d Moneylenders and Pawnbrokers § 1 (1971).
The third document Ms. Crosby signed is a "rental agreement." It confirms the above-described terms of the rental. Moreover, it states that in the event of a default, Quick Cash shall have the right to take possession of the car, "in addition to all other remedies afforded by law." This rental contract does not contain any language satisfying the statutory insurance requirements in section 627.7263, Florida Statutes (1991). It does not appear to have been written with any thought to the newly created article of the Uniform Commercial Code governing leases. See Ch. 680, Fla. Stat. (1991).
*900 Finally, Ms. Crosby signed a "right of repossession." This document provides that Quick Cash can repossess the car upon default and sell it. This document clearly states that Ms. Crosby "shall remain liable for any deficiency remaining after the application of the net proceeds of any such sale." Thus, this is not a pawn in which the pawnbroker looks exclusively to the value of the pledged property for repayment.
Although Ms. Crosby apparently did not sign such a document, other borrowers signed a document that purports to transform the loan transaction into a buy/sell transaction upon default. It is unclear whether this odd agreement eliminates Quick Cash's right to a deficiency or to pursue all other remedies afforded by law.
If one approaches this transaction from a business perspective, the "rent" is nothing more than an additional interest charge on a standard auto loan. After a weekly "service fee" of $5.00 is tacked on and sales tax is added, Ms. Crosby pays $468.90 over the ten-week period in exchange for the privilege of borrowing $200.00 from Quick Cash. The Division alleges that this results in an effective rate of interest of 690%, instead of the disclosed 18% rate.
We are convinced that the proverbial Philadelphia lawyer could not explain all the legal issues raised by these confusing documents. This transaction could easily be the feature question in a difficult law school exam. Therefore, it is understandable that the Division is concerned that the typical customer at a pawnshop could be deceived by these documents.
The issue in these cases, however, is not whether this transaction is moral or immoral. We do not decide whether individual customers could sue Quick Cash to void unconscionable leases or for damages under various theories. See, e.g., § 680.1081, Fla. Stat. (1991) (court may limit application of an unconscionable lease). Likewise, we do not consider whether the transactions may result in illegal usury or whether they are otherwise an appropriate subject for criminal prosecution. We determine merely whether the Division has authority to file an action to enjoin these activities under section 570.544(11), Florida Statutes (1991). We answer that question with a qualified, and somewhat preliminary, yes.

II. THE HILLSBOROUGH CASE
The Division's authority to bring suit concerning consumer issues is located in two subsections of section 570.544, Florida Statutes (1991). Subsection 10 states:
(10) If the division by its own inquiry, or as a result of complaints, has reason to believe that a violation of the laws of the state relating to consumer protection has occurred or is occurring, it may conduct an investigation, subpoena witnesses and evidence, and administer oaths and affirmations. If, as a result of the investigation, the division has reason to believe a violation of chapter 501, other than a violation of ss. 501.91-501.923, has occurred, the division with the coordination of the Department of Legal Affairs and any state attorney, if the violation has occurred or is occurring within his judicial circuit, shall have the authority to bring an action in accordance with the provisions of chapter 501.
As quoted, this subsection requires the Division to coordinate with the Department of Legal Affairs, i.e., the Attorney General, and with any relevant state attorney. Such coordination is not alleged in these complaints. Presumably, this subsection would allow the Division to seek a cease and desist order in an appropriate case under section 501.208, Florida Statutes (1991). Significantly, the Division did not choose to invoke this subsection as the basis for its authority in these lawsuits.[2]
In both the Hillsborough and Pinellas cases, the Division based its jurisdiction on subsection 11. That subsection was created by chapter 90-323, Laws of Florida, and states:
(11) If the division by its own inquiry, or as a result of complaints, has reason to believe that a violation of the laws of *901 the state relating to consumer protection has occurred or is occurring, that the interests of the consumers of this state have been damaged or are being damaged, or that the public health, safety, or welfare is endangered or is likely to be endangered by any consumer product or service, the division may commence legal proceedings in circuit court to enjoin such act or practices or the sale of such product or service and may seek appropriate relief on behalf of such consumers. Upon application by the division, a hearing shall be held within 3 days after the commencement of such proceedings.
The Division reads this provision expansively and maintains that it can file an action seeking an injunction within three days for a broad spectrum of problems that do not involve great risk of property damage or personal injury, and do not involve any serious risk to human health. For example, at oral argument, the Division maintained that it could sue any major bank for an injunction on three days' notice if it discovered a single instance of unlawful usury. Because of the disjunctive "or" in the statute, if read literally, the statute might allow the Division to seek an emergency injunction whenever the Division "has reason to believe ... that the interests of the consumers of this state ... are being damaged... ." We do not believe the legislature intended this expansive grant of authority and question whether the statute would be valid if so interpreted.
Quick Cash argues that subsection 11 should be read in conjunction with subsection 10, and that the statute only authorizes an action for injunctive relief if the challenged conduct is a violation of chapter 501. It believes the legislature intended to give the Division authority in subsection 11, in the event of an emergency, to act unilaterally to obtain the type of cease and desist order it would normally obtain under subsection 10 with the assistance of the Attorney General. In the Hillsborough action, Quick Cash failed to convince the circuit court that subsection 11 was limited to matters that violated chapter 501, but it did convince the circuit court that subsection 11 was limited to "consumer transactions" as defined in that chapter. Section 501.203(1), Fla. Stat. (1991). The trial court held that neither the pawn/loan transaction nor the automobile rental agreement was a "consumer transaction," and that the Division had no authority to obtain an injunction in the absence of such a consumer transaction. Accordingly, the circuit court quashed or dismissed the action.
At this stage in this case, we decline to determine the outer reach of the Division's authority. There are many factual and legal issues that have not been developed in the circuit court, and we are not convinced we could accurately describe the full authority that the legislature intended to give the Division. We conclude, however, for the reasons stated below, that the Division can allege a cause of action concerning both the pawn/loan transaction and the automobile rental agreement that would fall within the ambit of the Florida Deceptive and Unfair Trade Practices Act and might also justify an injunction. We reverse on that limited basis without determining the possible scope of subsection 11 beyond the reach of chapter 501.

A. The Rental Agreement

A "consumer transaction," as defined in section 501.203, includes a "lease ... of an item of goods ... for purposes that are primarily personal, family, or household... ." It is clear that the automobile leases in the nine alleged transactions fit within this definition. These leases also appear to be "consumer lease[s]," as defined in section 680.1031(1)(e), Florida Statutes (1991). Without deciding whether the leases could be unfair or deceptive for any other reason, we conclude that the failure of the leases to comply with section 627.7263, Florida Statutes (1991), could render them unfair and could leave the motoring public without adequate protection for the negligent operation of vehicles for which Quick Cash is presumably responsible under the doctrine of dangerous instrumentality. See Kraemer v. GMAC, 572 So.2d 1363 (Fla. 1990); Lynch v. Walker, 159 Fla. 188, 31 So.2d 268 (1947). If this circumstance is adequately alleged and proven, we conclude that the Division would have authority under section 570.544(11), Florida Statutes (1991), to obtain an injunction.

*902 B. The Pawn/Loan Agreement

The pawn/loan agreement presents a more difficult question. Quick Cash argues that it is a pawnbroker, primarily regulated by the Department of Revenue under chapter 538, and that it is not subject to the usury laws. This argument is too simplistic.
Quick Cash is correct that it is subject to regulation as a pawnbroker or secondhand dealer under part I of chapter 538. Those statutes, however, are not a comprehensive regulation of pawnbrokers. Instead, they address problems caused by the pawning of stolen property. In fact, automobiles are not within the definition of "secondhand goods," apparently because they are titled and cannot be easily sold by a thief. See § 538.03(1)(g), Fla. Stat. (1991). Thus, Quick Cash's unusual transactions involving automobiles are not regulated by the Department of Revenue.
Section 538.03(1)(d)1. defines "pawn" to include a "loan of money." Quick Cash argues that this definition and the traditions of pawnbrokers permit them to loan money without regard to the prohibitions against usury in chapter 687, Florida Statutes (1991). We disagree. While some pawn agreements, especially those that are structured as buy/sell agreements, may not be loans subject to usury regulation, we find nothing in Ms. Crosby's agreements or in the Florida Statutes that would exempt her agreement from laws regulating usury.[3]
We note that consumer finance is regulated by chapter 516. This chapter allows higher interest rates on "consumer finance loans" than on other types of loans. Section 516.031, Fla. Stat. (1991). Chapter 516, however, does not apply to "any bona fide pawnbroking business transacted under a pawnbroker's license." Section 516.02(4), Fla. Stat. (1991).[4] Indeed, "a pawnbroker may not be licensed to transact business under this chapter." Section 516.02(4), Fla. Stat. (1991).
If the Division can plead and prove that Quick Cash is unlawfully conducting business as a consumer finance company, or that it is engaging in a business method which involves criminal usury under section 687.071, Florida Statutes (1991), we conclude that this would involve a "disposition of ... a consumer service" that could constitute either an unfair method of competition or an unfair or deceptive act for purposes of the Florida Deceptive and Unfair Trade Practices Act, section 501.201, Florida Statutes (1991). Thus, the trial court improperly quashed this action. We reverse the order of dismissal. On remand, the Division should be allowed an opportunity to plead and prove a theory under the guidelines of this opinion.

C. The Pinellas Case

In the action filed in Pinellas County, the Division successfully obtained a temporary injunction. It presented evidence of only one transaction to obtain an injunction against "Quick Cash of Clearwater, Inc." The evidence did not clearly establish that the transaction involved Quick Cash of Clearwater, Inc., rather than Quick Cash of St. Petersburg. In light of this problem and the matters discussed in the previous section, we reverse the order of injunction and remand for further proceedings.

III. A NEED FOR LEGISLATIVE REVIEW
We are fully aware that this decision is somewhat tentative and does not address all of the issues that the parties hoped we would address. We have avoided any broad holding because the records on appeal are sparse and the applicable statutes are disjointed and confusing. We strongly encourage the legislature, at its earliest opportunity, to review both the authority granted in section 570.544(10) and (11), Florida Statutes (1991), and its overall regulation *903 of both buy/sell agreements and loan transactions by pawnbrokers. Although we have concluded that interest rates on loans at pawnshops may currently be subject to usury regulation under these circumstances, the legislature could make the law in this area far more precise.
Moreover, as argued by Quick Cash, we suspect that section 570.544(11) was intended as emergency authority to the Division to prevent serious, imminent risk of bodily injury, property damage or health hazards without time-consuming coordination with the Attorney General. As worded, however, this statute is much broader. The state has a strong interest in protecting consumers, but there will be chronic problems determining the authority of the Division and that of other departments of the executive branch unless section 570.544, Florida Statutes (1991), is clarified.
Reversed and remanded.
DANAHY, A.C.J., and PARKER, J., concur.
NOTES
[1] The several Quick Cash entities named in these two complaints, as well as in complaints pending in other circuits, are all engaged in similar consumer transactions, using similar written agreements. We will only identify specific Quick Cash corporations by individual name when that is necessary to explain the facts or the holdings in these two cases.
[2] In light of the difficulties discussed in this opinion, this more orderly approach to a cease and desist order might be the better practice for the Division in cases that do not involve great or imminent risks to person or property.
[3] At this stage in the proceedings, we make no determination of the legal effect of the documents that attempt to transform a loan into a buy/sell agreement in the event of a default.
[4] It is unclear what the legislature means by this phrase. Chapter 538 does not discuss a pawnbroker's license. The last time the state apparently provided for the issuance of a special pawnbroker's occupational license was in 1971. See § 205.434 Fla. Stat. (1969); Ch. 72-306, Laws of Florida.